UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HARDY,                 :
                               :CIVIL ACTION NO. 3:15-CV-305
          Plaintiff,           :
                               :(JUDGE CONABOY)
          v.                   :
                               :
CAROLYN W. COLVIN,             :
Acting Commissioner of         :
Social Security,               :
                               :
          Defendant.           :

---

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. (Doc. 1.)  Plaintiff originally alleged disability due to bipolar disorder, anxiety, depression, and hearing voices. (R. 195.)  Plaintiff identified his onset date as January 11, 2011. (R. 22.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Melvin Benitz, concluded that Plaintiff's severe impairment of depression with bipolar component did not alone or in combination with the non-severe impairments (kidney stones, high blood pressure and sleep apnea) meet or equal the listings. (R. 24.)  The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform a full range of work at all exertional levels with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy. (R. 26-29.)  The ALJ therefore

found Plaintiff was not disabled under the Act from January 15, 2011, through the date of the decision, May 7, 2013.  (R. 29.)

With this action, Plaintiff asserts that the decision of the Social Security Administration should be reversed and benefits awarded or, alternatively, that the case be remanded for further administrative proceedings.  (Doc. 11 at 9.)  He identifies a single error: "The ALJ committed a reversible error and harmful error of law by failing to discuss multiple GAF scores of 50 or below."  (Doc. 11 at 3.)

After careful consideration of the administrative record and the parties' filings, we conclude Plaintiff's appeal is properly granted.

## I. Background

### A. *Procedural Background*

On August 30, 2011, Plaintiff protectively filed an application for DIB.  (R. 22.)  As noted above, Plaintiff alleges disability beginning on January 15, 2011, due to bipolar disorder, anxiety, depression, and hearing voices.  (Doc. 11 at 2; R. 195.)  The claim was initially denied on December 2, 2011.  (R. 22.)  Plaintiff filed a request for a review before an ALJ on December 9, 2011.  (*Id.*)  On April 9, 2013, Plaintiff appeared and testified at a hearing in Dover, Delaware, before ALJ Norman Bennett.  (R. 35-68.)  Plaintiff appeared with his attorney, Stephanie Ott.  (R. 35.)  Vocational Expert ("VE") Ellen Jenkins also testified.  (*Id.*)

2

ALJ Melvin Benitz issued his decision on May 7, 2013, finding that Plaintiff was not disabled under the Social Security Act through the date of the decision.  (R. 29.)  On June 5, 2013, Plaintiff requested a review with the Appeal's Council.  (R. 8.)  The Appeals Council issued its decision on December 15, 2014, denying Plaintiff's request.  (R. 4-9.)

On February 11, 2015, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on April 29, 2015.  (Docs. 9, 10.)  Plaintiff filed his supporting brief on June 11, 2015.  (Doc. 11.)  Defendant filed her opposition brief on July 13, 2015.  (Doc. 12.)

**B.   *Factual Background***

Plaintiff was born on November 4, 1967.  (R. 28.)  He was forty-three years old on the alleged disability onset date.  (*Id.*)  Plaintiff has a at least a high school education.  (*Id.*)  In the October 24, 2011, Disability Report, he reported that he stopped working in January 2011 because of his conditions.  (R. 195.)  Plaintiff told his doctors and therapists that he was fired from his last job after a motor vehicle accident.  (R. 257, 269.)  After losing his job, Plaintiff applied for unemployment insurance and collected it for eighteen months.  (R. 46, 547.)  Plaintiff has past relevant work as a lawn worker and tractor trailer driver. (R. 28, 62.)

1.   **Impairment Evidence**

Plaintiff was hospitalized voluntarily at Mount Nittany Medical Center from January 19, 2011, to January 25, 2011.  (R. 254-59.)  He presented with severe depression as well as auditory and visual hallucinations.  (R. 254.)  On January 20th, he was assessed with a GAF score of 35.  (R. 259.)  During his hospitalization, Plaintiff realized that he needed to stay on his medications.  (*Id.*)  Upon discharge, his hallucinations had stopped, his mood was "great," his affect was "improved," and his anxiety was "gone."  (R. 254.)  His GAF at discharge was assessed at 45, and he was prescribed Lithium, Risperdal, and Klonopin.  (R. 254-55.)

The next day Plaintiff followed up regarding medications and made arrangements for counseling at Catholic Charities.  (R. 266.) He reported to caseworker Karen Hart that Lithium helped with his mood, his sleep was better with Klonopin, and he had no nightmares since starting Risperdal.  (R. 267.)  He also reported that he has a hallucination of a gargoyle named Maximus telling his to slow down and take a nap.  (R. 267.)  Ms. Hart assessed his GAF at 55. (R. 269.)

On March 2, 2011, Plaintiff saw Abdollah Nabavi, M.D.  (R. 270.)  Plaintiff told Dr. Nabavi that he had not been taking all of his medications and he was looking for a job.  (*Id.*)  Dr. Nabavi assessed that Plaintiff's mood was "a little down," his speech was

4

normal and relevant, he had no thought or perceptual disorder, and his affect was congruent.  (*Id.*)  Plaintiff's GAF was assessed at 65, and he was told to continue counseling.  (*Id.*)

Plaintiff returned to Dr. Nabavi on March 23, 2011, and April 6, 2011.  (R. 271.)  Dr. Nabavi's assessments included that Plaintiff had good judgment and insight, was alert and oriented, and had intact memory functioning.  (R. 271-72.)  At the March 23rd visit, Plaintiff reported that family members noticed his mood was "kind of down," and at the April 6th visit, he reported "I am doing good."  (R. 271.)

At Plaintiff's June 8, 2011, visit to Dr. Nabavi, he reported zoning out, paranoia, and auditory hallucinations.  (R. 271.)  Dr. Nabavi advised Plaintiff to talk with his primary care physician to get a neurological consultation.  (*Id.*)

During this time period Plaintiff was also going for counseling to Catholic Charities.  (R. 325-31.)  Sharon Felson was his therapist from January through August 2011.  (*Id.*)  She assessed the following GAF scores: 35 on January 31st; 33 on February 22nd; and 40 on March 21st.  (R. 336, 341, 348.)  Ms. Felson described Plaintiff as fearful, anxious, and inflexible about what he was capable of doing and how he negotiated the everyday world, noting that Plaintiff stated he would never work again if he could not drive a truck.  (R. 327-28.)

On September 12, 2011, Plaintiff called Community Hospital

reporting suicidal ideation and hallucinations. (R. 301.) On September 13, 2011, Plaintiff was admitted to the hospital because of depression and suicidal ideation. (R. 274, 305.) He reported auditory hallucinations of screams. (R. 275.) On admission Plaintiff was assessed with a GAF score of 25. (R. 274.) At his discharge on September 19, 2011, his GAF was assessed at 50. (R. 274, 276.) During his hospitalization, Plaintiff attended therapy, started to take Lithium again, and was prescribed Seroquel. (R. 276.)

On September 29, 2011, Plaintiff went to Delaware Health & Social Services Division of Substance Abuse & Mental Health. (R. 281.) He reported that he had been stable since his hospitalization. (*Id.*)

Plaintiff saw Duane D. Shubert, M.D., on October 5, 2011, and reported depression. (R. 286.) Plaintiff continued to see Dr. Shubert monthly through January 2012. (R. 286, 295-97.) Dr. Shubert noted on October 5th that Plaintiff's mood was depressed but his affect was appropriate and his thought process was normal. (R. 285.) Dr. Shubert assessed Plaintiff to have a GAF of 50. (R. 286.)

On May 14, 2012, Plaintiff went to Dover Behavioral Health Systems for depression and suicidal ideation. (R. 369.) Plaintiff again had hallucinations and was paranoid about his neighbor. (*Id.*) Plaintiff was admitted with a GAF of 25 and discharged on

6

May 21st with a GAF of 50.  (R. 373, 370.)  During his hospitalization, Plaintiff "did well" and was back on medication, taking Seroquel, Lithium, and Trazadone.  (R. 370.)

In January 2013, Plaintiff saw his therapist, social worker Heather Carpenter.  (R. 514-15.)  She assessed that Plaintiff was alert and oriented, his mood was euthymic, his affect congruent, he had no suicidal or homicidal ideation and his thought process was coherent and relevant.  (*Id.*)  She noted that Plaintiff was focused on obtaining disability benefits.  (*Id.*)

Plaintiff returned to Dover Behavioral Health Systems on February 21, 2013, reporting an increase in auditory hallucinations, paranoia, and suicidal ideation because he believed his disability hearing was cancelled when it was delayed.  (R. 518.)  He was admitted with a GAF of 20.  (*R. 527.*)  His Seroquel dosage was increased with good results.  (R. 520.)  His GAF at discharge from inpatient care on February 28th was 45. (R. 523.)  Plaintiff then attended the partial hospitalization program until March 22, 2013.  (R. 518.)  On March 22nd, Plaintiff was assessed with a GAF score of 60.  (*Id.*)  The Discharge Summary also noted that because Plaintiff had five hospitalizations in the previous two years, he was appropriate for a referral to a higher level of care such as intensive case management.  (*Id.*)

On March 8, 2013, Plaintiff reported to Ms. Carpenter at Sussex County Mental Health that he had gone to Dover Behavioral

Health because he was "more stressed out" and experiencing nightmares, irritable mood, mood swings and angry outbursts.  (R. 512.)  He told her about an altercation he had in the Walmart parking lot the day he went to the hospital and also the triggering effect of his Social Security hearing being postponed.  (*Id.*)

On March 13, 2013, Plaintiff reported to Ms. Carpenter that he had seen the gargoyle in November and December 2102.  (R. 511.)  When she was talking with a nurse at the partial hospitalization program about Plaintiff's status and progress, the nurse reported that, while in the program, Plaintiff said "bizarre things" and reported that he had not seen the gargoyle in the past year.  (*Id.*)

On March 29, 2013, Plaintiff saw Meritt Neasha, M.D., for a physical examination.  (R. 531.)  Dr. Neasha performed a mental status exam and assessed the following: Plaintiff was oriented x3 with appropriate mood and affect; he was able to articulate well; he had normal thought content; he had the ability to apply abstract reasoning; he exhibited no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation; and he demonstrated appropriate judgment and insight.  (R. 531.)

2.   **Opinion Evidence**

The Disability Determination Explanation included the opinion of Emanuel Schnepp, Ph.D.  dated November 15, 2011.  (R. 69-78.)  Dr. Schnepp concluded that Plaintiff had mild restrictions of activities of daily living, mild difficulties with maintaining

8

social functioning, moderate difficulties maintaining concentration, persistence or pace, and no repeated episodes of decompensation each of extended duration.  (R. 73.)  In finding Plaintiff not disabled, Dr. Schnepp provided the following explanation:

> The claimant has a longstanding history of bipolar disorder, which at times is associated with psychotic features, usually when he is not taking his medications as prescribed.  He has no history of grossly disorganized behavior.  The claimant is independent with ADLs, including driving. The claimant's mood has been negatively impacted by his current unemployed status and the financial stress related to that.  He is actively searching for work.  The MER suggests that the functional limitations resulting from the claimant's MH impairments do not preclude him from being able to meet the basic mental demands of competitive work on a sustained basis.  Based on the evidence of record, the claimant's statements are found to be partially credible.

(R. 73.)  Dr. Schnepp concluded that Plaintiff was able "to understand, retain, and follow simple instructions, i.e., perform one and two step tasks."  (R. 75.)  He also found Plaintiff's basic memory processes intact and that he could perform simple, routine, repetitive work in a stable environment, and make simple decisions. (*Id.*)  Dr. Schnepp concluded that Plaintiff could work at a consistent pace for routine and repetitive work, he could maintain concentration for reasonable periods, and he would be able to maintain regular attendance when provided with a consistent work schedule.  (*Id.*)

### 3.   __Function Report__

In the Function Report dated October 31, 2011, Plaintiff said that his impairment prevented him from working because he could not concentrate for very long, he heard and saw things that were not there, he gets depressed and manic, and he has "fast mood changes." (R. 225.)  Plaintiff testified that he is able to prepare simple meals, clean, do laundry, shop, and drive.  (R. 227-28.)  He reported his hobbies to be watching TV, walking, and riding a bike. (R. 228.)  Plaintiff also reported that he spends time with others, keeping in touch with friends daily through facebook and sometimes calling and texting.  (*Id.*)  Plaintiff noted that he had no problems getting along with family, friends, neighbors, or others. (R. 230.)

### 4.   __Hearing Testimony__

Plaintiff testified that he receives medicaid, has no source of income, and lives with his brother, who is retired.  (R. 40.)

When questioned about previous employment, Plaintiff testified that many previous jobs ended when he would "just walk off the job" or the boss would tell him not to come back "because most of their words were, you're crazy, don't come back."  (R. 44.)  When asked if his bosses were aware of his hallucinations and, if so, how, Plaintiff said that most of them were and they knew because they would see him talking to himself, "talking to the air and looking up in the air and talking to the gargoyle, to Maximus."  (*Id.*)

10

In response to the question of whether he had been looking for work, Plaintiff said that Dr. Shubert wanted him to try to apply for work when he had given up hope of getting a Social Security hearing and was depressed.  (R. 45.)  He said he applied online for a position at Walmart and never heard anything.  (*Id.*)  He also said he did not know if he would take the position had it been offered to him because he does "not get along with people at all. . . . I can't stand being around people."  (*Id.*)

Plaintiff testified that he had received unemployment compensation for about eighteen months but he does not believe he is able to work because he does not deal with "stress, change, people."  (R. 46.)  He also said he would need constant supervision which he would not like so he "wouldn't do it."  (*Id.*)  Plaintiff identified concentration and following instructions as additional work-related problems.  (R. 47.)

As an example of the effects of stress, Plaintiff cited an altercation he had with his brother where he threw and broke his cell phone, yelled and screamed at his brother and ended up checking himself into the Dover Behavioral Health hospital because he thought he was going to hurt himself.  (R. 48.)  Plaintiff said he was in-patient for a week and then went to a two-week partial hospitalization program.  (*Id.*)

Plaintiff reported that the partial hospitalization program helped him and taught him some new coping skills.  (*Id.*)  He stated

that he had been trying the new skills but they didn't work for him.  (*Id.*)  By way of example, Plaintiff told of an incident which took place in a Walmart parking lot where another driver tried to take a parking space he was "getting ready to pull into."  (*Id.*) When he said they had a "standoff in the parking lot for probably a half hour," he was asked what he meant and provided the following explanation:

> I was partway in the parking place and she
> was pulling through to get to it and I
> refused to move.  I kept pulling up on her
> tying to get her to back up.  I -- I
> threatened to slice all four of her tires,
> but it didn't happen.  I didn't have a knife
> or anything to do it with, but I did follow
> her about two feet behind her through the
> parking lot and into the store. . . . She was
> walking and I was screaming at the top of my
> lungs. . . . The only reason that that ended
> without probably the police being called was
> my brother was there and grabbed me and told
> me I needed to calm down and just let it go.

(R. 49.)  Plaintiff testified that things like this happen a lot, he has difficulty controlling his anger and he breaks things.  (R. 50.)

When asked about his relationship with his neighbors, Plaintiff said he "can't stand" them.  (*Id.*)

Plaintiff was also asked about the gargoyle and he said that he both hears and sees the gargoyle named Maximus five or six times a week.  (R. 51.)  He said that he feels like Maximus is in control and tells him

> to do things -- quit jobs, walk away.  I walk

>           away from my family.  I don't even talk to my
>           family a lot of times.  That's partly why my
>           brother lives with me is to take care of me
>           and make sure that I'm okay, but the
>           gargoyle, Maximus, he -- he hovers around and
>           he's -- he -- he was around last night and
>           this morning.  I saw him, but not here.

(R. 52.)

Plaintiff testified that he has problems even when he is taking his medications and, although he forgets to take them sometimes, he gets right back on them.  (*Id.*)  Plaintiff also noted that at times Maximus tells him not to take his meds and he listens.  (R. 53.)

Plaintiff described manic episodes of sleeplessness and casino binges and depressed episodes lasting up to two weeks.  (R. 54.) He said that he gets these episodes about once a month--the depressed periods more frequently than the manic.  (R. 55.)

At the time of the hearing, Plaintiff said he was seeing his psychiatrist, Dr. Shubert, once evey three months, and his therapist, Heather Carpenter, every other week.  (R. 56.)  Both wanted him to start more intensive counseling and he was waiting to see whether he would be accepted into the intensive program.  (*Id.*)

Vocational Expert Ellen Jenkins opined that Plaintiff was not able to perform his past relevant work.  (R. 65.)  She was asked to consider a hypothetical individual of Plaintiff's age and education who suffers mainly from depression with a bipolar component and

>           [h]is conditions are somewhat relieved with
>           his medications without significant side

> effects, but he indicates he takes pills and gets mildly sleepy, but when he takes them in the evening, he can't hardly function, goes to bed, and sleeps a long time and as a result I find that he's moderately limited in his ability to perform his ADLs and by moderate I mean one-third of the workday and to interact socially and to maintain his concentration, persistence, and pace due to his depression and bipolar and as a result, needs to have simple, routine, unskilled jobs, SVP 1 or 2 in nature; he's able to attend tasks and complete schedules; and low stress, low concentration, low memory, if I may embellish somewhat, I mean jobs that are one or two-step tasks; no production rate piece work; and jobs that have little decision making or changes in the work setting or judgment to do the work; and most of all jobs that allow him to deal with things rather than people; he has somewhat of a problem being around people throughout the workday; jobs that have only occasional conversation and interpersonal interaction; and the jobs that he'd be able to do at all exertional levels including medium and light and sedentary; and I'd like for you to give examples of light and medium.

(R. 63-64.)  The VE proffered several representative jobs that the hypothetical individual could perform and which existed in significant numbers in the national economy.  (R. 64-66.)

When Plaintiff's attorney added the limitations that the individual would be unable to handle work stress, changes in the workplace and could have only occasional contact with the public, supervisors and coworkers, the VE testified that no work would be available.  (R. 66.)  Plaintiff's attorney also asked the VE whether there would be any work if Plaintiff's testimony about concentration and attention problems related to hallucinations and

racing thoughts were credited.  (*Id.*)  The VE responded there would be no work for such an individual.  (*Id.*)  Similarly, the VE stated there would be no work for the ALJ's hypothetical individual if that person could not follow simple instructions due to hallucinations and concentration problems.  (R. 67.)  Finally, the VE testified that if the individual were going to be absent one to five times per month due to decompensation, depression, or manic behavior, no work would be available.  (*Id.*)

**5.    ALJ Decision**

ALJ Benitz rendered his decision on May 7, 2013.  He determined that Plaintiff had the severe impairment of depression with bi-polar component and the non-severe impairments of chronic kidney stones, high blood pressure, and sleep apnea.  (R. 24.)  He also determined that he did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment.  (*Id.*)  Regarding Listing 12.04, the ALJ found Plaintiff did not satisfy the "paragraph B" criteria: he had moderate restrictions in activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence or pace; and no episodes of decompensation which have been of extended duration.  (R. 25.)  The ALJ noted that "[e]ven though the claimant has past psychiatric hospitalizations, none were for two weeks or more to be of extended duration."  (*Id.*)  The ALJ also concluded the "paragraph C"

criteria were not satisfied.  (*Id.*)

ALJ Benitz noted that Plaintiff had the following residual

functional capacity: He has the ability

> to perform a full range of work at all
> exertional levels but with the following
> nonexertional limitations: moderately limited
> to perform ADL's, moderately meaning 1/3 of
> the day, and to interact socially and to
> maintain his concentration, persistence, and
> pace due to his depression and bi-polar.  As
> a result he needs to have simple, routine,
> unskilled jobs SVP 1 or 2 in nature.  He is
> able to attend tasks, complete schedules, and
> low stress, low concentration, low memory.
> That means jobs that are 1 or 2 step tasks,
> no production rate or pace work, and jobs
> that have little decision making or changes
> in the work setting or judgment to do the
> work.  Most of all, jobs that allow him to
> deal with things rather than people, and jobs
> that have only occasional conversation and
> interpersonal interaction.

(R. 26.)  The ALJ's RFC finding was based on his review of medical

and opinion evidence of record and his determination that

Plaintiff's statements concerning the intensity, persistence and

limiting effects of his symptoms were not entirely credible.  (R.

26.)  Specifically, the ALJ found that several elements in the

record called into question the credibility of Plaintiff's

allegations: Plaintiff's activities of daily living went beyond

limitations that would preclude work and he "was described as

inflexible about what he is capable of doing and how he negotiates

the everyday world."  (R. 27.)  The ALJ gave significant weight to

the opinion of State Agency consultant, Dr. Emanuel Schnepp.  (R.

16

27-28.)

With the RFC set out above, the ALJ further found, with the assistance of a VE, that Plaintiff was unable to do his past relevant work but jobs existed in significant numbers in the national economy that Plaintiff could perform.  (R. 28.) Therefore, he found Plaintiff not disabled at step five of the sequential process.  (R. 29.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[1]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing work that existed in significant numbers in the national economy.  (R. 29.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for

analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.   Neither the reviewing court nor the defendant "may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself."  *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits.  *See Dobrowolsky*, 606 F.2d at 406.  Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.  *Id.*  "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."  *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974).  As such,

the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406.  Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."  *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the decision of the Social Security Administration should be reversed and benefits awarded or, alternatively, that the case be remanded for further administrative proceedings because "[t]he ALJ committed a reversible error and harmful error of law by failing to discuss multiple GAF scores of 50 or below."  (Doc. 11 at 3, 9.)  We agree.

A GAF score was traditionally used by "mental health clinicians and doctors to rate the social, occupational, and psychological functioning of adults."  *See Irizarry v. Barnhart*, 233 F. App'x 189, 190 n.1 (3d Cir. 2007).  The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest.  *See Debaise v. Astrue*, No. 09-0591, 2010 WL 597488, at *5 n.7 (W.D. Pa. Feb. 16, 2010); s*ee also Diagnostic and Statistical Manual of Mental Disorders,* 32–34 (4th ed. text rev. 2000) ("DSM-IV").  A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in

communication or judgment or inability to function in almost all areas.  DSM-IV at 34.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  *Id.*  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Id.*  A GAF score of 51-60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  *Id.*  A GAF score of 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships.  *Id.*  A GAF score of 71-80 represents transient symptoms, if present, and expectable reactions to psychosocial stressors or no more than slight impairment in social, occupational, or school functioning.  *Id.*

Pursuant to Social Security Administration rules, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements."  *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009) (citing 66 Fed. Reg. 50746, 50764-65 (2000)).

While the significance and use of GAF scores has been debated since the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded

24

from considering GAF scores as evidence.  As explained in *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741 (M.D. Pa. Apr. 10, 2015),

> "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual [of Mental Disorders] ("DSM-5")." *Solock ex rel. F.A.R.P v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 5d,* 16 (2013)). "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders, DSM-516 (5th ed. 2013). In response, the Social Security Administration now allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and thus an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." SSA AM-13066 at 5 (July 13, 2013).

2015 WL 1608741 at 9 n.2.  The Third Circuit Court of Appeals concluded an ALJ's failure to discuss two GAF scores of 50 did not warrant remand in *Rios v. Commissioner of Social Security*, 444 F. App'x 532, 535 (3d Cir. 2011) (not precedential), but, significantly, the Circuit Court distinguished the situation from cases where the failure to discuss relevant GAF scores was deemed error because an ALJ is not permitted to "cherry pick" GAF scores

in support of his decision or ignore medical evidence that runs counter to his finding. *Rios*, 444 F. App'x at 535 (citing *Dougherty v. Barnhart*, No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006) (citations omitted)).

Here the ALJ cited three GAF scores--55, 60 and 65. (R. 27.) He does not mention the numerous GAF scores of 50 or below, and the record contains at least eleven assessments ranging from 25 to 50 from January 20, 2011, through March 12, 2013. (*See* Doc. 11 at 4.) As set out above, "[s]ince it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. ALJ Benitz did not provide a reason for citing the three GAF scores of 55 and above and not others. Because GAF scores in the low ranges may have serious implications on a claimant's ability to function, we cannot conclude that the ALJ's failure to mention scores of 50 and below is harmless error. Whether these scores suggest "a work-preclusive disability" as Plaintiff asserts (Doc. 11 at 7) is a matter to be assessed by the ALJ in the circumstances surrounding the assignment of the lower scores and in the context of the record as a whole. *See Dougherty*, 2006 WL 2433792, at *10 n.6. Therefore, we conclude this matter must be remanded to the Acting Commissioner for further consideration of this issue.

## **V. Conclusion**

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: July 27, 2015